FREDERICK W. BABCOCK *vs.* WILLIAM C. HUNTOON.

MAY 22, 1913.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

*(1)    Contracts.    Accord and Satisfaction.*

In an action to recover certain payments due for the sale of plaintiff's interest in a lease of oil lands, submitted to the jury on a plea of accord and satisfaction, setting up a later agreement between the parties as a bar to the action, evidence considered and:—

*Held,* that it was insufficient to sustain the plea and motion of plaintiff for new trial should have been granted.

BAKER, J., dissenting.

DEBT. Heard on exceptions of plaintiff and sustained.

PARKHURST, J.   This is an action of debt, with a count in covenant joined, brought in the Superior Court, in Providence County, and based on a written agreement under seal, dated February 5, 1909, between the defendant and his brother Harrison B. Huntoon on one side and the plaintiff on the other.   This agreement recited that the Babcock Petroleum Company had been organized, with five shares of stock issued to the directors, of which one share was held by said Babcock and the other four were then held by Harrison B. Huntoon, and that a certain bank held in escrow a lease on certain oil lands in California made by Conley & Evinger to one Greene, who had assigned it to the Babcock Petroleum Company.   The agreement then proceeded as follows:

"NOW THEREFORE, In consideration of thirty thousand dollars ($30,000) to be paid by said William C. Huntoon and Harrison B. Huntoon to said Frederick W. Babcock, five thousand dollars ($5,000) of which having been paid, receipt whereof is hereby acknowledged by said Babcock, and a like sum to be paid at the end of each succeeding six months until said thirty thousand dollars have been paid in full, but without interest, and of two hundred and fifty shares of the capital stock of said Babcock Petroleum Company or any company organized by said William C. Huntoon and Harrison B. Huntoon for the purpose of taking over said lease and developing said oil lands, to be delivered to said Frederick W. Babcock as soon as may be.

"Said Babcock hereby agrees to sell and transfer and does hereby sell and transfer to the said William C. Huntoon & Harrison B. Huntoon all his, said Babcock's right, title and interest in and to said oil lands and all machinery and other improvements thereon, his said share of said stock and all his rights of subscription to the capital stock of said company and of any holding company of said Babcock Petroleum Company that may be organized."

The only other part of this agreement that is of importance in this case is as follows:   "And it is hereby mutually agreed that said William C. Huntoon and Harrison B.

Huntoon shall each be held liable for one-half, and for one-half only, of any and all obligations or liabilities arising from this agreement."

The plaintiff's declaration set up this agreement and alleged that he had performed it on his part, but that the defendant had failed to make any payments beyond the first payment, the receipt of which was acknowledged in the agreement, and that the defendant therefore owed the plaintiff twelve thousand five hundred dollars ($12,500), with interest on the different installments from the dates when they were payable. Besides the usual pleas in traverse, the defendant filed a third plea, of accord and satisfaction, setting up a later agreement between the parties as a bar to the action.

Upon the motion of the plaintiff the defendant was ordered to file a bill of particulars, stating the character of the agreement set up in this third plea, whether it was oral, written or under seal. Accordingly the defendant filed a bill of particulars stating that the agreement referred to in this plea was verbal and not in writing.

The plaintiff also demurred to this plea and the demurrer was sustained. The defendant then, by leave of the court, filed an amended third plea and a fourth and fifth plea, all setting up this same later agreement, but describing it somewhat differently. The amended third plea alleges that after the execution of the written agreement sued on, dated February 5, 1909, to wit, on the 10th day of April, 1911, the plaintiff and defendant entered into an agreement with each other, which they agreed would be in substitution for said former agreement, and whereby in consideration that the defendant promised that he would assign and transfer to the plaintiff 1,256 shares of the capital stock of the Babcock Oil Company, being a portion of the shares in that company then owned by the defendant, the plaintiff accepted said promise of the defendant in lieu of all unperformed obligations of the defendant under said former agreement, and promised the defendant "that he would cancel said former

agreement and would receive and accept said shares of stock and would try to make a profit out of them, and if he should succeed in getting for said shares of stock more than $10 per share, he would pay over to the defendant one-half of the amount received for them by him, above $10 per share, up to a total payment to the defendant of $10 per share; and the said former agreement was thereby extinguised and discharged as to the defendant;" concluding with a verification, etc. It was under this amended third plea that the case was submitted to the jury.

The fourth plea describes the later agreement as one whereby, in consideration that the defendant promised that he would assign and transfer to the plaintiff the 1;256 shares of stock and would cause the corporation to issue to the plaintiff a certificate for these shares, the plaintiff promised that he would receive and accept said shares in full payment and satisfaction of all unperformed obligations of the defendant under the former agreement and would discharge said agreement. It then alleges that the defendant thereupon did assign and transfer to the plaintiff the said 1,256 shares of stock and caused a certificate for the same, duly signed by its proper officers, to be issued by said corporation to the plaintiff, *who received and accepted the same* and that thereby the earlier agreement was satisfied and discharged as to the defendant.

It being shown in evidence that the plaintiff never *"received* and *accepted"* the certificate, this plea did not go to the jury.

The fifth plea is an equitable plea under the statute permitting equitable defences to be pleaded in actions at law and alleges that after the execution of the written agreement, dated February 5, 1909, to wit, on the 10th day of April, 1911, the plaintiff and defendant entered into a *written* agreement with each other, whereby in consideration that the defendant promised to assign and transfer to the plaintiff the 1,256 shares of stock, the plaintiff promised that he would never bring any action against the defendant upon the

written agreement of February 5, 1909, and would receive and accept said shares of stock in full payment and satisfaction of all obligations assumed by the defendant in that agreement; and setting forth the other terms of the agreement substantially as in the third plea; that since the making of the agreement of April 10, 1911, the defendant has always been ready and willing and has offered and hereby offers to perform fully on his part the said agreement of April 10, 1911, and that therefore the plaintiff cannot in equity and good conscience, in violation of the said later agreement, maintain any action against the defendant upon the written agreement of February 5, 1909. It being shown in evidence that there was no *written* agreement as alleged in this plea, the court refused to submit this plea to the jury.

So that the case as tried was submitted to the jury under the amended third plea only, it not being disputed that the sealed agreement of February 5, 1909, was duly executed and delivered by the parties and that the plaintiff had duly performed his part of that agreement.

The case was tried before a jury in the Superior Court October 7–10, 1912, and resulted in a verdict for the defendant. The plaintiff duly filed and prosecuted his bill of exceptions to this court, after the denial of a motion for new trial by the trial judge.

The evidence showed that at the time the first agreement was made, the plaintiff had the control of a lease of certain oil lands in California under an assignment of this lease by Conley & Evinger. Payments of considerable amounts had to be made to one T. L. Moran, a previous owner of the lease, and by the contract providing for the assignment by Conley & Evinger other large payments had to be made to them and were secured by a mortgage to them of the leasehold interest. The total payments to be made amounted to about $175,000. If these payments and the payments called for by the lease were not made, or if the property was not developed as required by the lease, the lease would be forfeited. Some development work had already been done on the property, but it was not yet on a paying basis.

The Babcock Petroleum Company had been organized to take an assignment of the lease and to develop the property, but it had not yet taken over the property and only five of its shares had been issued, for the purpose of organization only. At this time Mr Babcock was in very poor health and had to give up active business. Consequently he was anxious to give up the control of this proposition and to get rid of its active management. Therefore he got the Huntoon brothers interested and made with them the contract sued upon, dated February 5, 1909.

After this contract was made the Babcock Oil Company was organized with the defendant as president and Harrison B. Huntoon as treasurer. The lease was transferred to it and it assumed all obligations thereunder and the payments to be made at stated intervals to Moran and to Conley & Evinger, amounting, as before stated, to about $175,000. The capital stock of this corporation consisted of 5,000 shares of the par value of $100 a share. Of these shares 250 were issued to the plaintiff in accordance with the agreement. The other shares went to the defendant and his brother and other persons who put money into the enterprise. A great deal of money was put in and the development of the property carried on, but it did not get on a paying basis and in the winter of 1910–1911 the company was in financial difficulties.

At this time Mr. Babcock had regained his health and again began to take some interest in the oil business. He knew a Pennsylvania capitalist by the name of Ferdicks, who was interested in oil properties and who is stated to have been willing to advance $100,000 for this enterprise, if he found the state of the property and its financial condition satisfactory. In February, 1911, Mr. Babcock made a trip to California and met Mr. Ferdicks there, for the purpose of showing him this property. The latter did not go to see the property at first, because there was an option out against it, and later because he became ill and unable to go. Mr. Babcock left him and went himself. He inspected the

property and sent back to the defendant a favorable report of the prospects in a telegram, dated February 20, 1911. But it does not appear that Mr. Ferdicks ever saw the property, or was ever fully informed either as to its physical condition, or as to its liabilities, or that he ever obtained from any source any such knowledge as would have enabled him to come to any conclusion whether he would or not become interested in it. It appears that at the time when the plaintiff visited the property in California in February and March, 1911, the company was heavily embarrassed, unable to pay its overdue accounts, amounting to several thousand dollars, and that its creditors were pressing for payment; and in the letters written by the defendant to the plaintiff at that time, defendant repeatedly urged plaintiff to interest some capitalist or to aid in raising some money, and even to advance money himself, to help pay off the most pressing obligations. It is evident from these letters that the defendant and the plaintiff both knew that the financial condition of the Babcock Oil Company was desperate. The plaintiff, before leaving for California, February 9, 1911, had requested a full statement to date of the obligations of the company, but testifies that he never received it. It was, however, known to both parties that there was still an indebtedness of $30,000 to the lessors, Conley & Evinger, secured by mortgage on the property, and that a note of $10,000 of that indebtedness was due February 15, 1911, while plaintiff was in California. It was also known to both parties that certain stockholders had advanced to the company, on demand notes, $53,200; and that there was an amount of $6,500 to become due to T. L. Moran at some uncertain date on receipt of a certain Government patent for the property. On the whole, there was an indebtedness of upwards of $90,000 upon the property, and the company was unable to meet even its accounts for wages and supplies, and there was no money in sight for payment of any maturing obligations. The plaintiff on March 14, 1911, wired to defendant from California: "I leave for home night train

Wednesday to evade the threats from mob of note-holders and many creditors." . . . It is to be noted that if the company did not pay its obligations to its lessors as mortgagees, and failed to develop the property by drilling, etc., it was liable to lose the property by the entry of the lessors for breach of the lease; that there was a note of $10,000 to said lessors due on February 15, 1911, which was only extended by agreement to March 15, 1911; that another note for $10,000 was due to the same parties August 15, 1911, and a third note for $10,000 was due to the same parties February 15, 1912. It does not appear that any of these notes was ever paid. It is also to be noted that, at the time of the plaintiff's visit to the oil-fields, little or no oil was being produced; that it had become evident that the shallow wells were a failure; and that in order to produce oil in paying quantities it was necessary to drill to a depth of from 2,300 to 2,600 feet; that to drill one well to that depth would require an expenditure of $20,000; and it is also quite evident from all the correspondence that the plaintiff had no money with which to protect the property or to undertake its further development, and that the defendant and the other stockholders had either exhausted their resources (as was the case with defendant) or were unwilling to make further advances; and that nothing could be done to save the property unless outside parties could be induced to interest themselves and new capital be brought in.

Such were the financial circumstances of this property known to all the parties in interest when the plaintiff returned to Providence in the latter part of March, 1911. At that time the property was liable to forfeiture under the lease for non-payment of the $10,000 note due the lessor February 15, 1911, and only verbally extended to March 15, 1911.

Under these circumstances the following claims are set up by the defendant, as summarized by his counsel; that the plaintiff on his return from California, had separate interviews with the two Huntoons; that Harrison B. Hun-

toon testified that the plaintiff said that he wanted to acquire enough of his shares in the company at $10 a share to liquidate what he owed the plaintiff under the agreement of February 5, 1909; that the plaintiff figured it up and 1,004 shares was the number fixed, Harrison B. Huntoon having paid one payment of $2,500, besides the first payment made when the agreement had been entered into; that he (H. B. Huntoon) accepted the proposition and an agreement was reached; that he called the plaintiff's attention to the fact that the option previously given had been for $20 a share, which was about what the plaintiff had figured their stock had cost the Huntoons, and the plaintiff said: "If I get this company in shape and if I sell it, I will pay you the difference between $10 and $20 a share," and he said: "All right."

According to the defendant's testimony the plaintiff came to him the next day, which appears to have been April 8th or 9th, 1911, and made a similar deal with him for 1,256 shares of his stock in liquidation of what he owed the plaintiff under the agreement.

The plaintiff denied explicitly and in detail that any such agreement was made with either one of the Huntoons.

The plaintiff claimed throughout his testimony that he did not have any money with which to finance this property that he was solely interested in trying to get Ferdicks or some one else from the outside to take over the property and to furnish new capital; and that he never at any time wanted to take over these shares of stock to himself, but only to have an option or control over a majority of the shares so as to enable him to deal with such person or persons as he might be able to interest in the proposition, with the assurance that he could give control of the company to carry out his negotiations.

Now, while it is true that the defendant and his brother did attempt in their direct testimony to show that a definite contract had been entered into with the plaintiff, whereby the plaintiff accepted their promises to transfer said shares of stock to him in substitution for their obligations to him

under their sealed agreement to pay him the balances due thereunder, to wit, $10,000 and interest due from H. B. Huntoon, and $12,500 and interest due from W. C. Huntoon, the defendant, we think that the evidence taken as a whole fails to show any such contract or agreement in substitution for their obligations under their sealed agreement. After a long cross-examination of the defendant, his testimony is finally limited in such a way as to destroy to a great extent the effect of his direct testimony; said cross-examination, so far as it applies to the interview between the plaintiff and defendant, when the defendant claims that a new contract was made in discharge of all obligations under the sealed agreement, is as follows: (references being to pages of transcript) Q. 168 (p. 128): "Now, when he got there there was some desultory conversation and finally you got at this agreement which you have set up here; the agreement that you have set up in your pleas. State what was said by Mr. Babcock and yourself that you claim constituted that agreement. A. Why, I said, Mr. Babcock, having taken my brother's stock this stock of mine gives you the control of the company and you can do as you wish now. I asked him— Q. Now, Mr. Huntoon, can't you understand what I mean? Do you really mean to say that you don't understand my question? A. Well, I can't truthfully say that I do understand, Mr. Champlin. Q. Have you any objection to telling the words of that verbal agreement? A. I haven't any objection at all if I can remember them. Q. Well, I don't ask you to state them any farther than you can remember them. Give them in substance as near as you can. A. Well, Mr. Babcock says, 'All right, I have control; if you want to stay with the company you can, in the capacity you are now in.' Q. Now, Mr. Huntoon—" MR. CHAMPLIN: "MR. GARDNER, could you make your client understand?" MR. GARDNER: "I think so. Mr. Champlin wants you to tell what language was used in making this agreement. Not what he said after the agreement. He wants you to begin where Mr. Babcock came into the office

that day and first took this matter up, what he said to you and what you said to him, I suppose. Q. Very well. Do you understand your attorney? A. I don't know as I do now. Mr. Babcock came in there and we got to talking about the stock." MR. GARDNER: "When you got to talking about it what did you say?" Witness: "Why, he says, 'I have taken Harry's stock. Do you want to do the same?' Q. Now, go on and tell the substance of the talk. A. I said, 'I will. Did you make any deal with my brother?' He says, 'Yes.' I says, 'What was it?' He says, 'I told him I would pay him up to $20.00 a share if I sell this company.' I says, 'Will you do the same with me, Mr. Babcock?' He says, 'Yes.' 'All right,' I says, 'then we will consider this thing closed.' That is about all there was to it. I said, 'Simply put that on paper, will you? Bring it up to me. We will consider it closed as it is.' Q. That all? A. That is all. Q. Nothing else said? A. Not that I recall. Q. Sure of that, are you? A. Yes. Q. Now, that constituted, that talk, that entire agreement that you made there with him that day, did it? A. Why, that was really not—all of our conversation that was vital to it. That was the principal point. Q. Well, what is the rest of it with reference to this matter? A. Well, we talked about the conditions out there. We talked about things as we hoped they would be in the future and points of that kind. I cannot recall them all. Q. Was there anything else said which constituted any further agreement between you and Mr. Babcock? A. I recall nothing else. Q. Then when you said, 'We will consider it closed and you put that in writing,' that ended the talk as far as the agreement went? A. Yes, sir."

Following the testimony above quoted, it having previously been shown that the defendant had already made out in the name of the plaintiff a certificate for 1,256 shares of stock duly signed and sealed, the defendant testified that he did not at that time deliver the certificate to the plaintiff, nor at any subsequent time, because the plaintiff never put

his agreement into writing, and because, since that time the plaintiff did not come up to see the defendant.

This testimony of the defendant falls far short of sustaining the burden of proof which the defendant has assumed by his plea of accord and satisfaction under the amended third plea. It is to be noted that not a word is said in this cross-examination about the surrender, or cancellation or satisfaction of the original agreement. ' The whole transaction is based upon the future sale of the property and it is to be noted that the defendant was hoping to get an additional $10 per share in case of such sale. The most that can be inferred from this testimony, taken with all the other testimony in the case, is that the parties were hoping to sell out this property to outside parties as the only means whereby they could avoid losing their entire investment; and the most favorable construction for the defendant, that can in any manner be inferred from this testimony, is that the plaintiff was willing in the future in case he made a sale of this property whereby he was able to realize upwards of $10 per share from the stock agreed to be transferred to him, that he would then cancel the sealed agreement of February 5, 1909, and would pay to the defendant, in addition to such cancellation, a sum not to exceed $10 per share in cash. It is significant in this connection that the sealed agreement was left uncancelled in the hands of the plaintiff, and was never demanded either by the defendant or by his brother to be surrended by the plaintiff for cancellation; that immediately after this alleged agreement of April 1911 was made, it was learned by the parties in interest that Mr. Ferdicks was dead, having never recovered from the illness from which he was suffering when the plaintiff left California, and he being the only person who is shown by the evidence to have ever shown any interest looking to a possible purchase or financing of the property; and that thereafter the defendant never sought to have the plaintiff put their alleged agreement into writing or to deliver the stock to the plaintiff with a view to compel the plaintiff to carry out any agreement

between them. All this testimony is consistent with the plaintiff's claim that he never intended to become the purchaser of the stock for his own interest, but only for the purpose of enabling him to carry out a sale to outside parties; and that he never agreed or intended to agree to cancel the original agreement; and is entirely inconsistent with the defendant's claim of a novation or an accord and satisfaction. Again the plaintiff's position is supported by the probabilities of the case. With no person who was under any obligation to the plaintiff either to purchase or to finance this property, with no means of his own, and with no assurance of aid or forbearance on the part of the other stockholders holding the obligations of the company to the extent of upwards of $53,000; with a note for $10,000 overdue to the lessors and mortgagors whereby the lease was liable to be forfeited; with another note for $10,000 coming due August 15, 1911, to the same parties; with the property producing little or no oil from the wells already drilled; with the immediate necessity of further drilling at enormous expense, to lower levels as the only chance of making the property profitable; with no means to pay even outstanding accounts payable for labor and supplies, and with "a mob" of noteholders and many creditors clamoring for their pay, it is hardly conceivable that the plaintiff would have negotiated (1) for an absolute transfer of the majority of the stock to him, which stock had then no value whatever, and would have agreed to surrender his claims, for $22,500 and accrued interest, against the Huntoons in exchange therefor. We think the defendant's amended third plea under which alone the case was submitted to the jury is not supported by the weight of the evidence, as finally explained in the testimony of the defendant as finally given, as above quoted. We think the plaintiff's motion for a new trial should have been granted on the ground that the verdict was against the weight of the evidence, and plaintiff's exception 11 is therefore sustained.

As to the exceptions regarding the admission and exclusion of testimony, we do not find any such reversible error therein as to require discussion. In most cases the testimony upon which the objections were based was of little consequence to either party, except as showing certain details with regard to the management of the corporation and the mutual transactions of the parties, and are unimportant.

As to the special requests to charge the jury granted or refused, we find no error therein. The general charge was not excepted to in any particular and inasmuch as we have found that the court should have granted a new trial on grounds fully set forth above, the charge to the jury becomes unimportant.

We have read with great interest the learned briefs of counsel on the principles of law relating to accord and satisfaction, and we do not find any serious disagreement between them as to such principles. But as we have found from the evidence that the evidence for the defendant does not preponderate in showing an accord and satisfaction, but at most only an agreement for a future accord and satisfaction, in case the plaintiff was able to sell the property, we have not found it necessary to review the authorities cited.

Plaintiff's exception No. 11 is sustained; the other exceptions are overruled and the case is remitted to the Superior Court for a new trial.

BAKER, J., dissents.

*Irving Champlin, James Harris,* for plaintiff. *John C. Knowles,* of counsel.

*Gardner, Pirce & Thornley,* for defendant. *William W. Moss,* of counsel.

KATE. COOK *et al. vs.* JAMES COOK *et al.*

MAY 22, 1913.

PRESENT: Johnson, C. J., Parkhurst, and Sweetland, JJ.

*(1) Wills. Construction.*

A will should be so construed as to avoid partial intestacy if such construction is natural and reasonable and the intent of the testator appearing from the will taken as a whole, rather than any particular technical word or phrase, should govern.

*(2) Wills. Construction. "Savings Banks."*

A holographic will, by which testator bequeathed and devised specifically all of his property and which contained no residuary clause, after enumerating all of his real and personal property, bequeathed to his wife "one-fifth part of the money in Business Bank Account" and also "one-half of all money I have in Saving Banks":—

*Held,* that the term "Saving Banks," included not only money in savings banks thus entitled, but also money on deposit in the participation accounts of trust companies having savings departments.

*Held,* further, that the bequest was not affected by the fact that negotiable and contingent certificates had been issued by a trust company in exchange for the deposit of testator on participation account, upon the reorganization of the trust company, the manner in which the deposit was evidenced being immaterial.

BILL IN EQUITY for construction of will. Certified under Gen. Laws, 1909, cap. 289, § 35.

JOHNSON, C. J. This is a bill in equity brought by Kate Cook, William Cook, Charlotte I. Cook, Williminer Cook, Kate Cook and Ann Cook (the last four being minors who bring this bill through their next friend and mother by adoption, Kate Cook), all of the city and county of Providence, in said State, Willie Collins, a minor, by his next friend and father, Harry L. Collins, of the city of Boston, in the Commonwealth of Massachusetts, Kate Cook Collins, also of said Boston, and Janet Cook Crowley, of the town of Greenwich, in the State of Connecticut, against James Cook and Charlotte Cook Sayles, both in their individual capacity

and in their capacity as administrators with the will annexed of William Cook, deceased, and against Allison Cook, a minor and son of said James Cook, said Allison Cook and James Cook being residents of said Providence, and the said Charlotte Cook Sayles being a resident of the city of Central Falls, said county of Providence and State of Rhode Island. Said cause has been certified to this court by the Superior Court as ready for hearing for final decree, under cap. 289, § 35, Gen. Laws, 1909.

The bill sets out: the death of William Cook; a copy of his will; the probate thereof; the declination of the executor therein named; the appointment of Charlotte Cook Sayles and James Cook as administrators with the will annexed; a prior request by the parties to this bill to the Supreme Court for an opinion on various matters involving certain questions pertaining to the will and estate of William Cook, deceased, and refers to the opinion thereon reported in 30 R. I. 494. It further sets out the filing of a bill of interpleader against all the parties to this suit by the Citizens Savings Bank, and a final decree therein by consent of certain of the parties, but not of Kate Cook, and certain proceeding thereunder relative to a certain deposit in the Citizens Savings Bank, resulting in the payment to one Sidney F. Whipple of said deposit; also certain other allegations not material upon the question of construction of the will.

The complainants further represent that they and the defendants are all of the children, heirs at law and persons interested under the said will of William Cook, deceased.

Service was made upon all the respondents. Howard T. Metcalf was appointed by the Superior Court guardian *ad litem* of the aforesaid minors Charlotte I. Cook, Kate Cook, Williminer Cook and Ann Cook, and James Cook was appointed guardian *ad litem* of his infant son, Allison Cook.

The respondents, James Cook and Charlotte Cook Sayles, in their individual capacity and in their capacity as administrators with the will annexed of William Cook, and James

Cook in his capacity as father, next friend and guardian *ad litem* of Allison Cook, a minor, and Howard T. Metcalf, guardian, *ad litem* of Charlotte I. Cook, Williminer Cook, Kate Cook and Ann Cook concurred in the amended bill and joined in the prayer for the construction of said will.

By "Exhibit A" attached to said bill, a copy of said will was set forth as follows: "Exhibit A. Copy of Will of William Cook, of Providence, R. I. In the name of the Lord Amen.

"I William Cook of the City and County of Prov. in the State of R. I. being of lawful age, of sound and disposing mind, calling to mind the frailty and uncertainty of life, and being desirous of disposing of that property which God has blessed me with, do make publish and declare this and this only, to be my last will and testament.

"FIRST—I give and bequeath to my wife Kate Cook the use of my house and furniture and lands not otherwise disposed of, as long as she lives. Said house and lands are at 735 Smith Street, Prov. I also give and bequeath to her one-fifth part of my building at 14 No. Main Street, Prov. Also I give her one-fifth part of the business carried on there, also one-fifth part of the stock, fixtures, leases and money in Business Bank Account. I also give her one-half of all money I have in Saving Banks.

"SECOND—I give and bequeath to my oldest daughter Charlotte Cook Sayles and her heirs forever, my house and lands not otherwise disposed of, at 735 Smith St., Providence, also the furniture in said house. Said property to become hers at once but my wife to have sole use of said property till her death. I also give and bequeath to my daughter and her heirs, one-fifth part of my building at 14 No. Main St. Prov. to be hers and her heirs forever. Also I give her one-fifth part of the business carried on there, also one-fifth part of the stock, fixtures, stock, leases there and other places. Also one-fifth parts of money in Business & Bank Account. I also give her one-quarter of all moneys I have in

.Saving banks. I give her more so she will make a home for my adopted children, one of them being feeble-minded.

"THIRD—to my son James Cook and his heirs, I give .and bequeath one-fifth part of my building at 14 No. Main St. Prov. also one-fifth part of the business carried on there .also one-fifth part of the stock, fixtures and all leases, and money in business & bank account. I also give him all my ·carriages harnesses and automobile.

"FOURTH—to my son William Cook I give and bequeath to him and his heirs one-fifth part of my building at 14 No. Main St. Prov. Also one-fifth part of the business carried ·on there. Also one-fifth part of the stock, fixtures and leases .and business bank account.

FIFTH—to my adopted daughter Charlotte I. Cook, and her heirs I give and bequeath one-fifth part of my building .at 14 No. Main St. Prov. Also one-fifth part of the business carried on there also one-fifth part of the stock, fixtures and leases and money in business bank account. I also give .her my diamond ring. I also give her one-quarter of all .moneys I have in Savings Banks. I also give and bequeath to my adopted daughter Charlotte I. Cook and heirs forever ·three (3) lots of land situated on the northerly side of Hilltop Avenue Providence. Said lots are marked 34, 35, 36 on the plat from 7 Grosvenor.

"SIXTH—to my daughter Kate Cook Collins I give the :sum of ten dollars, she having already got five thousand ·dollars from me.

"SEVENTH—to my daughter Janet Cook, I give the :sum of ten dollars, she being in no need of my property.

"EIGHTH—to my adopted daughter Kate Cook and her heirs I give and bequeath three lots of land on the southerly ·side of Hilltop Avenue, Providence. Said lots are numbered ·9–10–11 on the plat.

"NINTH—to my adopted daughter Willimina Cook, I give and bequeath to her and her heirs three lots of land on the southerly side of Hilltop Avenue Prov. said lots are .numbered 6–7–8 on the plat.

"TENTH—to my adopted daughter Ann Cook I give and bequeath to her and her heirs two lots of land on the northerly side of Hilltop Avenue Providence, said lots being numbered 33 and 32 on the plat.

"ELEVENTH—to my grandchild, Allison Cook and his heirs I give and bequeath two lots of land on the northerly side of Hilltop Avenue Providence said lots being numbered 30 and 31 on the plat.

"TWELFTH—to my grandson Willie Collins I give my gold watch and chain and my sword and guns and my books.

"THIRTEENTH—I appoint the Treasurer of the Rhode Island Hospital Trust Co. bank to be executor of this my last will and I ask him to see that my grave is lined top bottom and sides with stone slabs.   The money for which as well as for his work to come out of my Saving bank money before being divided.

"In witness whereof I hereinto set my hand and seal.

"WILLIAM COOK (Seal).

"Signed, sealed, published and declared by the said William Cook as and for his last will and testament in presence of us who at his request and in his presence and in presence of each other, have subscribed our names as witnesses hereto.

"JOSEPH DELEVGON (Seal)<br>"JOHN METZGER (Seal)

"Dated at Providence R. I., 28 February 1908."

The bill also states: "Third.   That at the time of his death on May 27, 1908, said William Cook had on deposit in his own name (apart from deposit of $1,516.95 in the Industrial Trust Company's checking or business bank account) the following accounts:

| | |
|---|---|
| (a)  Industrial Trust Company participation account | $2,817.05 |
| (b)  Rhode Island Hospital Trust Company participation account | 4,083.14 |
| (c)  Peoples Savings Bank | 2,914.16 |

(d)  Union Trust Company (negotiable cer-
        tificates 2277, 2278 and 2279, and con-
        tingent certificates 2277, 2278 and 2279,
        all of which certificates were given in
        exchange for a deposit in the participa-
        tion account of said Union Trust Com-
        pany at the time of the re-organization
        of said Company) .................... 2,875.99
(e)  Citizens Savings Bank ................. 2,791.11
                                              _____
          Total ........................... $15,481.45"

The request for construction is as follows:

"Tenth.  The complainants in this cause desire the con-
struction of said will of William Cook, deceased, and re-
spectfully request this Court to determine the following
questions:

"a.  Under the first clause of the will of William Cook,
does his widow, Kate Cook, take one-half the entire deposits
in the Peoples Savings Bank, and in the participation ac-
counts of the Industrial Trust Company and Rhode Island
Hospital Trust Company and one-half of said negotiable
and contingent certificates in Union Trust Company, or does
she take simply one-half of the deposit in the Peoples Savings
Bank alone?

"b.  Does Kate Cook, widow of William Cook, under said
first paragraph of the will of said William Cook, deceased,
take any share in the said deposit in the Citizens Savings
Bank?"

We do not suppose that in order to be a "saving bank" or
"savings bank" it is necessary that the name of the corpora-
tion should express the fact that it is such.  The mere
designation by the name of savings bank we apprehend is
immaterial.  Its character must be determined by a con-
sideration of its organization, powers and mode of doing
business provided in the incorporation act.  Thus, where a
loan and trust company incorporated to do a trust business,
a safe deposit business, and a general banking business, has

a savings department in which term savings deposits are received upon a specified rate of interest, the corporation, as respects its term savings deposits, has been held to be *de facto* a savings and loan corporation, whether so *de jure* or not, and to have been properly assessed for taxation upon the amount of credits, claims, debts, and demands due, owing, or accruing for or on account of such term deposits. *Los Angeles v. State Loan and Trust Co.*, 109 Cal. 396.

The court, p. 404, says: "Respondent saw proper to classify its business, and designated one part as the 'savings department,' and named certain hours for that business. It received a large amount of deposits in that department in full accordance with one of the modes of conducting a savings and loan corporation as authorized by the statute. It gave to the depositor a pass-book which denominated the deposits therein entered as 'savings deposits.' It assumes to be a savings bank *pro tanto*, at least, in obtaining the deposits, and should not be heard to say that it is not when the question of taxation arises, whether it arises between the bank and the State or between it and the depositor."

In *State* v. *Lincoln Savings Bank*, 82 Tenn. 42, also a suit for the collection of a tax, the court, p. 43, says: "It is true that in the Act of January 11, 1869, incorporating the defendant, it is named the 'Lincoln Savings Bank;' but the mere designation of it by this name does not make it a savings bank. To determine its character we must look to its organization, powers and mode of doing business, provided in the incorporation act."

In the matter before us, however, we do not apprehend that we are necessarily concerned as to the organization, powers and mode of doing business prescribed in the acts of incorporation of the trust companies named in the bill. The fact that said trust companies have on participation account the deposits of the testator is set out in the bill. Whether they were empowered under their charters to have savings accounts, whether called participation accounts or otherwise, is not the question before us. The question which

we have to consider is whether said deposits are included in the words "all money I have in saving banks." Did the testator so intend?

The fact that these deposits were made in what are called trust companies does not, in our opinion, affect their nature. It is well known that trust companies, such as those set out in the bill, have long maintained savings or participation departments, and that their rules and manner of doing business connected with such departments are practically the same as those under which savings banks do business.

In practically every essential respect, a deposit in an institution called a savings bank is the same as a deposit in the participation account of a trust company such as those involved in this bill. Also, the rules, regulations and methods of doing business in the participation branch of trust companies are entirely different from those of the checking or business department. In the latter, the money is always on call, it draws a smaller percentage of interest and no notice is necessary to enable the depositor to draw the money.

The testator himself divided his deposits throughout his will between what he calls "business bank account" and "saving banks" or "savings banks." What did he mean by these expressions? He had, as appears from the third paragraph of the amended bill of complaint, a deposit of $1,516.95 in the checking account of the Industrial Trust Company. All his other deposits were in savings banks and the participation accounts of trust companies. Is it not properly inferable that he intended by these expressions to give to his wife one-fifth of the Industrial Trust Company checking account, under the name of a business bank account, and one-half the money in the participation accounts of the Industrial Trust Company and the other trust companies, under the words, "all money I have in Saving banks"? Is it probable that in thus providing for his wife, he did not realize the difference between a business bank account and a savings or a participation account? He was

a man of mature age and had been in active business for many years. This will was entirely in his own hand writing and was evidently prepared without the advice of counsel. It is not drawn with the technical accuracy that might be expected had it been prepared by an experienced attorney. From a careful reading of the will itself and a consideration of the circumstances under which it was drawn, it seems probable that when he used the term "business bank account" he meant the ordinary checking account, and when he used the words "money in saving banks" he meant savings accounts in the various institutions where he had deposits, whether such banks were entitled savings banks or trust companies. It does not seem probable that a man of Mr. Cook's age and experience could have confounded his two accounts, or that he meant by the expression "business bank account" anything other than the deposit in his checking account in the Industrial Trust Company.

From an inspection of the will itself, it appears that all of Mr. Cook's property is bequeathed and devised specifically. He makes provision for all his estate, real and personal, and the will has no residuary clause. He provides that the fees of the executor and for the lining of his grave shall be taken from his savings bank money before being divided. Having thus enumerated all the parts of his real and personal property and having specified his cash assets as "business bank account" and "money in saving banks," the gift to his wife in the clause referred to can easily be determined. What becomes of these participation accounts if they are not included in his expression "money in saving banks"? They certainly cannot be considered "business bank accounts."

If, therefore, they are not included under the words "all money I have in saving banks," then they are not disposed of by the will. If such interpretation be given his will, we find Mr. Cook making specific devises and bequests of every article of his property, real and personal, except these particular deposits in the participation accounts referred to. It seems illogical that such a conclusion should be drawn or

such an interpretation be placed on his will as would admit of such a conclusion, especially after Mr. Cook has used diligent care to enumerate his devises and bequests in detail.

(1) The general rule is to so construe a will as to avoid partial intestacy, if such construction is natural and reasonable. *Staples* v. *D'Wolf*, 8 R. I. 74; *Pell* v. *Mercer*, 14 R. I. 412, 417; *Smith* v. *Greene*, 19 R. I. 558, 560; *Fiske* v. *Fiske*, 26 R. I. 509, 512; *Woodward* v. *Congdon*, 34 R. I. 316, 323.

The intention of the testator is to be ascertained and be given effect if possible consistently with established rules of law. The court should place itself in the position of the testator as nearly as may be, and endeavor, if possible, to give his language such interpretation as will carry out his intention. In other words, the intent of the testator as it appears from his will taken as a whole, rather than any particular technical word or phrase, should govern. *Bailey* v. *Brown*, 19 R. I. 669; *Boardman, Petitioner*, 16 R. I. 131; *Woodward* v. *Congdon, supra.*

*Fitzgerald & Higgins,* for complainants.
*Frank H. Wildes, Barney & Lee,* for respondents.